

U.S. Department of Justice

*United States Attorney*
*District of Maryland*
*Southern Division*



| | | | |
|---|---|---|---|
| *Kelly O. Hayes*<br>*Assistant United States Attorney*<br>*Kelly.Hayes@usdoj.gov* | *Mailing Address:*<br>*6500 Cherrywood Lane, Suite 200*<br>*Greenbelt, MD 20770-1249* | *Office Location:*<br>*6406 Ivy Lane, 8th Floor*<br>*Greenbelt, MD 20770-1249* | *DIRECT: 301-344-0041*<br>*MAIN: 301-344-4433*<br>*FAX: 301-344-4516* |

December 18, 2018

The Honorable Paul W. Grimm
United States District Judge
District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

      Re:    United States v. Nkeng Amin,
                  Criminal No. PWG-17-661

Dear Judge Grimm:

      In light of the Defendant's decision to plead guilty to the Indictment filed in the above-referenced case without the benefit of a plea agreement, this letter sets forth, as applicable, the minimum and maximum statutory penalties of incarceration, fines, and terms of supervised release for the offenses to which the Defendant seeks to plead guilty. It also addresses a number of matters the Government submits will be relevant to the Court's Rule 11 colloquy.

Offenses of Conviction

      1.    The Government believes the Defendant will plead guilty to Count One and Count Two of the Indictment now pending against him, which charges him, in Count One, with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349; and, in Count Two, with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).

Elements of the Offenses

      2.    The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

      **Count One (Conspiracy to Commit Wire Fraud)**: That on or about the time alleged in the Indictment, in the District of Maryland, (1) the Defendant and at least one other person, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire fraud; and (2) the Defendant knew the unlawful purpose of the plan and knowingly and voluntarily became part of the conspiracy.

**Count Two (Conspiracy to Commit Money Laundering)**: That on or about the time alleged in the Indictment, in the District of Maryland, (1) the Defendant and at least one other person, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit one or more of the substantive money laundering offenses proscribed under 18 U.S.C. § 1956(a); (2) the Defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the Defendant knowingly and voluntarily became part of the conspiracy.

## Penalties

3. The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | N/A | 20 years | 3 years | $250,000 or not more than the greater of twice the gross gain or twice the gross loss, whichever is greater | $100 |
| 2 | 18 U.S.C. § 1956(h) | N/A | 20 years | 3 years | $500,000 or twice the value of the property involved in the transaction, whichever is greater. | $100 |

    a.    Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

    b.    Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

    c.    Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

    d.    Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

   e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

   f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

   4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

   a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

   c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

   d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If

the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

        e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

        f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

        g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

        h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

Advisory Sentencing Guidelines Apply

5.      The Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

6. The Government would prove beyond a reasonable doubt the factual allegations contained in Attachment A. In addition, the Government submits that the following applicable sentencing guidelines factors apply:

Count One (Conspiracy to Commit Wire Fraud):

a. The base offense level is **7**, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(1).

b. An **18**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(1)(K), because the loss was more than $3.5 million but not more than $9.5 million.

c. A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved 10 or more victims.

d. A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(10)(B), because a substantial part of the fraudulent scheme was committed from outside the United States.

e. The adjusted offense level for Count One thus is **29**.

Count Two (Money Laundering Conspiracy):

f. The base offense level is **29**, pursuant to U.S.S.G. § 2S1.1(a)(1).

g. A **2**-level increase applies, pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because the Defendant will be convicted under 18 U.S.C. § 1956.

h. A **2**-level increase applies, pursuant to U.S.S.G. § 2S1.1(b)(3), because the offense involved sophisticated laundering.

i. The adjusted offense level for Count Two thus is **33**.

Grouping:

j. Because Count One embodies conduct that is treated as an adjustment in provisions applicable to Count Two, and the offense level is determined largely on the basis of the total amount of harm or loss, the counts group, pursuant to U.S.S.G. §§ 3D1.1, 3D1.2(c) and (d), and 3D1.3. The total offense level thus is **33**.

k. This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level, pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office

may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant's criminal history could alter the Defendant's offense level. Specifically, Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

## Restitution and Forfeiture

8. The Government will seek entry of both a Restitution Order and a Forfeiture Order in the full amount of the victims' losses, which will be determined prior to sentencing and which is at least **$1,021,474**.

## Factual Allegations

9. Certain of the Factual Allegations that the Government would have proven beyond a reasonable doubt had this matter gone to trial are included in Attachment A.

## No Agreement

10. Given that the parties have not entered into any plea agreement, there are no agreements, promises, undertakings, or understandings between the Defendant and the Government with respect to the Guidelines calculation, the Defendant's criminal history, the sentence to be recommended, or any other issues relating to sentencing.

Very truly yours,

Robert K. Hur
United States Attorney

By: _/s/ Kelly O. Hayes_
Kelly O. Hayes
Assistant United States Attorney

## ATTACHMENT A: STATEMENT OF FACTS
### United States v. Nkeng Amin

*If this matter had gone to trial, the Government would have proven the following facts beyond a reasonable doubt. The following facts do not encompass all of the evidence which would have been presented had this matter gone to trial.*

At all relevant times, the Defendant, **NKENG AMIN, a/k/a "Rapone" ("AMIN"),** was a resident of Beltsville, Maryland. **Aldrin Fon Fomukong, a/k/a "Albanky," a/k/a "A.L." ("Fomukong"),** was a resident of Greenbelt, Maryland, and **Yanick Eyong ("Eyong")** was a resident of Bowie, Maryland.

"Drop Accounts" were bank accounts opened or controlled by **AMIN, Fomukong, Eyong**, and their co-conspirators that were used to receive money from victims. On or about February 7, 2017, **AMIN** opened Bank of America account x9244 ("BOA x9244") in the name of JB Studio LLC. On or about June 17, 2017, and June 19, 2017, respectively, at the direction of **Fomukong** and **AMIN**, **Eyong** opened Bank of America account x0042 ("BOA x0042") and TD Bank account x3845 ("TD Bank x3845"), both in the name of CL Escrow LLC.

Victim E was a resident of California. Victim G was a business located in Massachusetts. Victim K was a resident of California.

### *The Wire Fraud Conspiracy*

Between in or about February 2016 and in or about July 2017, in the District of Maryland and elsewhere, **AMIN** and **Fomukong** did knowingly and willfully combine, conspire, confederate, and agree with each other and other persons to knowingly devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises ("the scheme to defraud"), and for the purpose of executing and attempting to execute the scheme to defraud did knowingly and willfully transmit and cause to be transmitted by means of wire communication, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343.

It was part of the conspiracy and scheme to defraud that **AMIN, Fomukong**, and their co-conspirators gained access to email accounts associated with the Victims. It was further part of the conspiracy and scheme to defraud that **AMIN**'s co-conspirators sent false wiring instructions to the Victims' email accounts from spoofed email accounts. It was further part of the conspiracy and scheme to defraud that **AMIN, Fomukong, Eyong**, and their co-conspirators opened and/or managed the Drop Accounts in order to direct into and receive millions of dollars from the Victims. It was further part of the conspiracy and scheme to defraud that **AMIN**'s co-conspirators caused the Victims to use the wires to transfer money to the Drop Accounts. It was further part of the conspiracy and scheme to defraud that **AMIN, Fomukong, Eyong**, and their co-conspirators disbursed the money received from the Victims into the Drop Accounts by, among other transactions, using wires to transfer money to other accounts, by initiating account transfers to

other accounts at the same bank, by withdrawing sums of money, by obtaining cashier's checks, and by writing checks to other individuals or entities.

### *The Money Laundering Conspiracy*

Between on or about January 1, 2011, and in or about February 2017, in the District of Maryland and elsewhere, **AMIN**, **Fomukong**, and **Eyong** did knowingly combine, conspire, and agree with each other and others persons to conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity—to wit, conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349—while knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity and (a) with the intent to promote the carrying on of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

It was part of the conspiracy and scheme to defraud that **AMIN**, **Fomukong**, **Eyong**, and their co-conspirators opened and/or managed the Drop Accounts in order to receive millions of dollars into those accounts from the Victims. It was further part of the conspiracy and scheme to defraud that **AMIN**, **Fomukong**, and their co-conspirators caused the Victims to use the wires to transfer money to the Drop Accounts. It was further part of the conspiracy and scheme to defraud that **AMIN**, **Fomukong**, **Eyong**, and their co-conspirators disbursed the money received from the Victims into the Drop Accounts by using wires to transfer money to other accounts, by initiating account transfers to other accounts at the same bank, by withdrawing sums of money, by obtaining cashier's checks, and by writing checks to other individuals or entities, all to promote wire fraud conspiracy and other criminal conduct, and to hide true ownership and disguise the nature, source, and control of those assets.

In furtherance of the wire fraud and money laundering conspiracies, and to effect the objects thereof, **AMIN** committed and caused to be committed the following acts, among others, in the District of Maryland and elsewhere:

### *Victim E*

On or about February 7, 2017, **AMIN** registered the fictitious business JB Studios LLC in Maryland. On or about February 7, 2017, **AMIN** opened BOA x9244 in the name of JB Studio LLC. On or about April 25, 2017, **AMIN** provided **Fomukong** the account information for BOA x9244. On or about May 2, 2017, a co-conspirator caused Victim E to wire $458,500 into BOA x9244, controlled by **AMIN**.

On or about May 3, 2017, after receiving the $458,500 wire transfer from Victim E into BOA x9244, **AMIN** made a $220,000 wire transfer to Bank of America account x3599 ("BOA x3599"), controlled by Individual 5. On or about May 3, 2017, **AMIN** obtained from BOA x9244 a $105,000 cashier's check made out to Business 3 and a $98,000 check made out to Individual 6. On or about May 3, 2017, **Fomukong** used the $105,000 cashier's check to purchase from

Business 3 a 2012 Bentley Continental, bearing VIN SCBFR7ZA8CC070453. On or about May 3, 2017, **AMIN** made a $500 ATM withdrawal from BOA x9244, controlled by **AMIN**. On or about May 3, 2017, **AMIN** made a $5,000 cash withdrawal from BOA x9244, controlled by **AMIN**. On or about May 3, 2017, **AMIN** made a $2,500 cash withdrawal from BOA x9244, controlled by **AMIN**.

*Victim G*

On or about June 15, 2017, at the direction of **AMIN**, **Eyong** registered the fictitious business CL Escrow LLC in Maryland and provided the business registration documents to **AMIN**. On or about June 16, 2017, **AMIN** provided **Fomukong** the business registration documents. On or about June 17, 2017, at the direction of **AMIN**, **Eyong** opened BOA x0042. On or about June 21, 2017, **Fomukong** provided a co-conspirator the information for BOA x0042, including the bank name, account number, account holder address, and business name (CL Escrow). On or about June 21, 2017, **Fomukong** provided **AMIN** with Victim G's name, "reason for wire," and "reason for cashier's check." On or about June 21, 2017, a co-conspirator caused Victim G to wire $6,000,000 into BOA x0042, controlled by **Eyong**.

On or about June 21, 2017, after receiving the $6,000,000 wire transfer from Victim G into BOA x0042, at the direction of **AMIN**, **Eyong** made a $2,350,000 wire transfer to a bank account located in South Africa in the name of Business 5. On or about June 22, 2017, at the direction of **AMIN**, **Eyong** obtained three cashier's checks from BOA x0042, each for $95,000 and in the name of Business 6. Then, on or about June 23, 2017, at the direction of **AMIN**, **Eyong** obtained three additional cashier's checks from BOA x0042: a $95,000 check in the name of Individual 7, a $95,000 check in the name of Business 6, and a second $95,000 check in the name of Business 6.

*Victim K*

After **Eyong** registered the fictitious business CL Escrow LLC in Maryland, at the direction of **AMIN**, **Eyong** opened TD Bank x3845 on or about June 19, 2017. On or about July 13, 2017, a co-conspirator caused Victim K to wire $292,830.10 into TD Bank x3845, controlled by **Eyong**. On or about July 14, 2017, **Fomukong** provided **AMIN** an image of wire instructions related to a wire in the amount of $292,830.10 from Victim K to TD Bank x3845. On or about July 14, 2017, after receiving the wire transfer from Victim K into TD Bank x3845, at the direction of **AMIN**, **Eyong** made a $5,000 cash withdrawal from a TD Bank branch in Beltsville, Maryland. On or about July 14, 2017, **Eyong** made a separate $5,000 cash withdrawal from TD Bank x3845 from a TD Bank branch in Laurel, Maryland. On or about July 14, 2017, **Eyong** obtained a $58,500 check made out to Business 3, which **Fomukong** used to purchase a 2014 black colored Land Rover bearing VIN SALGS2WF5EA158828.

In total, the actual loss to Victims E, G, and K caused by **AMIN** and his co-conspirators was $1,021,474, and the intended loss was $6,751,330.

A substantial part of the fraudulent scheme was committed from outside the United States, specifically South Africa. In addition, the scheme involved sophisticated laundering, in that

**AMIN** and his co-conspirators created fictitious entities, used shell companies, layered the monetary transactions into multiple levels in order to make them appear legitimate, and used offshore financial accounts (namely, accounts located in Cameroon and South Africa, among others) to complete the scheme.